# HOME B. & L. ASS'N v. ROBT. KILPATRICK.

APPEAL BY PLAINTIFF FROM THE COURT OF COMMON PLEAS
OF DELAWARE COUNTY.

Argued February 12, 1891—Decided March 2, 1891.
[To be reported.]

1. Where the owner of mortgaged property caused a third person to give his check in settlement of the mortgage, and, the mortgagee failing to present it for payment with due diligence, the check so given became worthless, the drawer having withdrawn the deposit and become insolvent, the mortgage debt was discharged: Kilpatrick v. B. & L. Ass'n, 119 Pa. 30.
2. The evidence as to the authority of the solicitor of a building and loan association to receive a check in satisfaction of the association's claim against one of two properties covered by a mortgage to it, being partly written and partly parol, it was proper to submit the question of authority to the jury, as one of fact.
3. When matters of fact, depending on oral testimony, are connected with and necessary to a proper understanding of written evidence, the court is not bound to construe the latter as though it stood alone; an admixture of oral and written evidence draws the whole to the jury: Denison v. Wertz, 7 S. & R. 372; Sidwell v. Evans, 1 P. & W. 383; McGee v. Northumberland Bk., 5 W. 32.

Before PAXSON, C. J., STERRETT, GREEN, CLARK and WILLIAMS, JJ.

No. 256 January Term 1891, Sup. Ct.; court below, No. 10 March Term 1887, C. P.

On December 10, 1886, the Home Building & Loan Association sued out a writ of scire facias sur mortgage against Oliver Troth, mortgagor, and Robert Kilpatrick, terre-tenant. Service of the writ having been made, Kilpatrick appeared and filed an affidavit of defence. A rule for judgment for want of a sufficient affidavit of defence having been made absolute, judgment was entered in favor of the plaintiff for $1,943.55. Upon writ of error, the Supreme Court afterwards reversed this judgment, awarding a procedendo : Kilpatrick v. B. & L. Ass'n, 119 Pa. 30.

Issue having been joined, the case was tried on September 27, 1888, when the following facts were shown :

On May 23, 1885, Oliver Troth executed and delivered to the building association, plaintiff, a mortgage upon two improved lots in the city of Chester, as security for the payment of a loan of $3,800 made to him by the association. In June, 1885, Troth sold one of the lots to Robert Kilpatrick for $2,200, engaging to convey to him an unencumbered title. For the purpose of raising a part of the purchase money, Kilpatrick applied for a loan to George Beebe, a real estate agent who had been employed by one Washburn to invest in a mortgage the sum of $1,500. Beebe agreed to loan this sum to Kilpatrick upon a first mortgage of the property about to be conveyed to him by Troth, and Kilpatrick executed a mortgage thereon in favor of Washburn for that amount. Kilpatrick, Beebe and Troth then met at the office of Patrick Bradley, who was the secretary of the building association and had charge of the books containing the accounts between it and the borrowers and other members. Bradley informed them that the amount due upon the association mortgage was $2,760, and that $1,380.20 would be the amount required to relieve from the mortgage the house and lot which Kilpatrick was buying.

These statements of Bradley were admitted in evidence against the objection of the plaintiff; exception. [1] Previous to their admission, Bradley testified that it was the custom for the secretary to make settlements ascertaining the amounts due to the association when loans were to be paid off.

The defendants proposing to show a payment to the solicitor of the association of the amount specified by the secretary, on the occasion referred to, the plaintiff's counsel objected to all evidence of payment to the solicitor, without proof of his authority from the association to receive it.

By the court: Offer admitted with the understanding that it is to be followed up by showing authority to receive the money; exception. [2]

Testimony was then given, tending to show the following facts: By Kilpatrick's direction, Beebe, who had in his hands the $1,500 loaned to the former by Washburn, drew a check for $1,380.20, in favor of Bradley. Bradley, however, returned the check, declining to receive it for the reason that he was personally interested in the transaction, being an equitable owner of the property the title to which was held by Troth,

### Statement of Facts.

and directed Beebe to draw another check and give it to Mr. W. R. Bliss, the solicitor of the association. Within a day or two after that, to wit on June 6, 1885, Beebe went to Mr. Bliss's office, and not finding him in, left on his table a check for $1,402.50, drawn by Beebe on the Chester National Bank and payable to Bliss, accompanied by the following memorandum:

|  |  |  |  |  |  |  |
|---|---|---|---|---|---|---|
| " Kilpatrick mortgage, | . | . | . | . | $1,380 | 00 |
| Satisfaction, | . | . | . | . |  | 25 |
| Rents collected, less commission, | . | . | . |  | 22 | 25 |
|  |  |  |  |  |  |  |
| Amount of check, | . | . | . | . | . | $1,402 50 " |

The rents referred to in the memorandum were due to the building association. They had been placed for collection in the hands of Bliss, and Beebe had been employed by the latter to collect them.

Finding the check and memorandum upon his office table, Bliss saw Beebe and received from him an explanation of the transaction respecting the mortgage. Bliss, testifying for the plaintiff, narrated the conversation, as follows :

" I explained to him that the check was not sufficient to meet the purpose that his statement set out ; that the rents he had collected were not correct. There was some discussion, and I told him that there was a balance due, and I objected to a statement of that amount. I asked him in the conversation about the Kilpatrick matter; I did not know Kilpatrick, and did not know anything about the Kilpatrick mortgage; and Mr. Beebe explained that to me as being intended to be in payment of the mortgage upon one of those houses; and I then explained to him that it was impossible to satisfy the mortgage of Troth upon the payment of the amount set out in this check. Q. What was the reason? A. The reason was, the mortgage covered both houses, and the association had not agreed to release either one of them, and I had no power to release ; I have no authority whatever to release. Q. You have no authority to release ? A. No, sir, and I explained that to Mr. Beebe in this conversation. He said that there was a clear title to be made. I asked if I should make that release, and he said no ; and he said the sellers of the property were to pay for all papers except the recording of the deed. I handed this check back to him and said,

### Statement of Facts.

I cannot accept this check, because it is not sufficient to meet the claim in reference to the rent, and as for the building association matter I know nothing. I asked him to give me a separate check for the rent. He said there would be no difficulty about having the release fixed up; that he would see Mr. Bradley or Mr. Troth at once, and have it fixed up, and asked me to hold this check until he got this fixed up; I said I would hold it."

On the same day, after the conversation with Beebe, Bliss wrote his monthly report to the directors, as the solicitor of the building association, in which was the following statement: "I have received to-day from George Beebe a check for $1,380.20, which I understand is intended to secure a release of the mortgage against one of Mr. Troth's houses;" followed by a request for instructions as to what he should do. The action taken by the directors of the association upon the report of the solicitor was entered upon the minutes as follows: "The solicitor's report was presented and accepted. The solicitor stated that it was proposed to pay off the loan on the eastern house, which this association gave to Oliver Troth on property on Washington street, between Barclay and Penn streets. On motion of Mr. Spencer, the solicitor was authorized to satisfy the mortgage upon payment of the amount due the association."

Bliss testified that this action was not formally communicated to him in writing, but that the secretary informed him of it verbally. He continued to hold Beebe's check until some time in September or October, when he left it, unindorsed, at the bank on which it was drawn, with instructions to deliver it to Beebe the first time he should come in. He afterwards saw Beebe, told him what had been done with the check, and secured from him a new check for the amount of the rent account.

On June 6, 1885, the check for $1,402.50 was good, and it remained so until June 25th, when the balance in the bank to Beebe's credit was insufficient, by a small amount, to meet it. On July 2d, it became good again and remained so until July 27th, when the balance on deposit was less by $6 than the amount of the check. On two occasions, between July 27th, and August 17th, there were sufficient funds on deposit to meet the check, but at no time after the latter date did the amount of the deposit equal that of the check, and by December, 1885,

Statement of Facts.

Beebe had checked out all moneys standing to his credit, and had became insolvent.

As bearing upon the authority of the solicitor to receive the check of Beebe in payment of one half of the mortgage, the by-laws of the association were put in evidence. By § 6 thereof, his duties were prescribed as follows:

"§ 6. The solicitor shall perform all the legal writing for the association, such as drafting bonds, mortgages, notes, briefs of titles, and whatever forms of security may be required, at the proper cost of the borrower. He shall give advice and opinion in the legal matters concerning the welfare of the association and perform all duties relating thereto, and shall receive a commission of five per cent on all collections made by him when ordered by the board of directors, and in case a judicial sale is necessary he shall in addition to said commission receive for each such sale the sum of ten dollars. For all suits conducted by him he shall be paid such sum as the board shall determine. He shall make monthly reports to the directors of the condition of all matters in his hands, and shall receive an annual salary of ten dollars."

It was shown, also, that Bliss held a letter of attorney, executed by the proper officers, and under the corporate seal of the association, empowering him " to enter satisfaction on the record of all mortgages in the office of the recorder of Delaware county, in said state, standing in the name of the said the Home Building & Loan Association, and also all judgments in the Court of Common Pleas of said county, standing in the name or to the use of the said the Home Building & Loan Association, as full and effectual in all respects when done as if the same were done by the proper officers of the said association in their official capacity."

Bradley, the secretary of the association, testified on its behalf in part as follows:

" Q. What officer, according to the custom of this association recognized by the directors, is the officer to receive payment of mortgages from debtors who desire to pay the loan off? A. Part of the time the treasurer and sometimes the solicitor; although I cannot now recall any particular case in which the solicitor did. The general rule was to pay it to the treasurer. . . . . . Q. Mr. Bliss was the solicitor of this association from

*Charge of Court below.*

its commencement? A. Yes, sir.  Q. Do you know of any instance in which he received the money of a borrowing stockholder to be paid off? A. I said in answer to my other question, no, which I had prior to this time, and I cannot recall any since.  Q. Then, so far as you know, it was the practice of this association, so far as Mr. Bliss, the solicitor, is concerned, that he never did receive any money or moneys due upon the mortgages that were being paid off? A. So far as I remember I cannot recall a case."

The witness was asked by defendant's counsel to state what amount per month was paid to the association by Troth, after the date at which the check was given to Bliss by Beebe.

Objected to.

By the court: Objection overruled; exception.[3]

Mr. Broomall: What were the monthly payments after that time? A. The first payment made by Troth after that time was August 1, 1885, $32; then it ran along two or three payments.  The fifty-fourth payment, September 5, 1885, $32.

By the court: Q. What did he pay August 1st? A. $32. Q. September 5th the same? A. September 5th, $32.  On December 5th, 1885, he paid $10.  That is all the payments in this book.

It was shown, however, that Troth had another loan of $3,200, beside that for $3,800.  The witness testified, further, that on September 3, 1887, Troth paid to the association $1,524.16, which was one half of what would be due on the mortgage at that time, if the Beebe check of June 6, 1885, were not regarded as paid.

At the close of the testimony, the court, CLAYTON, P. J., charged the jury in part as follows:

Mr. Bliss tells you that he was not satisfied when he received the check with the amount for which it called, and that he was unwilling to accept it, because in the first place he knew nothing about the amount which was due the association on this mortgage, and in the second place the amounts which were included in this statement he did not believe them to be as °much as Mr. Beebe owed.  He therefore was not satisfied, I say, to receive the check in the way in which Mr. Beebe had left it.  On the day, however, he received it, or possibly the

Charge of Court below.

day after, at any rate the sixth of June, he advised the association as its solicitor that he had received from George Beebe a check for $1,380.20, which he understood was intended to secure a release of the mortgage against one of Mr. Troth's houses. . . . . That was the understanding which Mr. Bliss had at that time of this transaction, at least that is the information he sent this association as its solicitor, and he presented it to them for instructions.

[Now, gentlemen, what of the association? We learn from their minutes that the solicitor stated that it was paid, and proceeded to pay off the loan on the eastern house which this association gave to Troth. This was the construction which the association put upon Mr. Bliss's communication. The solicitor considered that it was proposed to pay off the loan on the eastern house which this association gave to Troth. Then, on motion of Mr. Spencer, who I presume is one of the directors, the solicitor was authorized to satisfy the mortgage upon the payment of the amount due the association. Now, these are the instructions which the association gave their solicitor, according to his request. The solicitor was authorized to satisfy the mortgage upon the payment of the amount due the association. Did that mean the amount due on the mortgage? You will bear in mind that the mortgage covered the two houses, the eastern house and the western house. Did they mean that he was to satisfy the mortgage upon receiving the whole amount due upon the mortgage? You will see that Mr. Bliss in his communication informs them that it was intended to obtain a release upon one of Troth's houses, and they put upon their minutes that they understood from their solicitor that it was intended to pay off the lien on one of the houses. Now, gentlemen, you must determine whether or not that was what this association meant; whether Mr. Bliss was not to receive this money until the whole amount was paid, or whether, when they said the amount due to the association, they meant the amount due to enable Mr. Troth to convey this eastern house free from the mortgage; and when Mr. Bliss received this amount of money for the association, was he authorized to act, and if so, was he to satisfy or release it? Now, what amount was necessary to do this? You will see that if it was to satisfy the mortgage, it would require some $2,700 or $2,800

Charge of Court below.

If it was to satisfy that part of the mortgage which might be regarded as relating to the eastern house, then it would be about $1,380.20. Now, what did the association mean when they instructed Mr. Bliss to satisfy this mortgage upon receiving the amount due the association? Was it to get the whole amount that might be due upon the mortgage, or was it to receive that proportion which would enable Troth to convey this eastern house relieved from the lien of the mortgage? What was in the minds of these parties? What did they intend by these two communications? What were the instructions given by the solicitor and what was he to do, what was it his duty to do?] [4] . . . . .

Now, gentlemen, you must determine from the evidence in the case whether or not this check was accepted by Mr. Bliss as the agent of this association, or whether it was repudiated. If it was accepted by him, then did he use due diligence in presenting it for payment? . . . . .

The plaintiff requests the court to charge:

1. Kilpatrick having taken a conveyance of the property with notice of the mortgage of the plaintiff upon it, the plaintiff is entitled to a verdict unless Kilpatrick paid the mortgage in full.

Answer: We cannot affirm that point in its particular language. As I have said, if this company had intended that this mortgage was to be paid before it was released, then until Mr. Kilpatrick has paid that mortgage in full he cannot be relieved of his liability on it. But if the company simply intended to receive from him the amount which was due upon the property which he was about to buy, then he is not liable. [5]

2. The giving of a check by the witness, George Beebe, Jr., was not payment of the mortgage, unless the check was afterwards paid.

Answer: I have already virtually affirmed that point.

3. Mr. Bliss, the solicitor of the plaintiff, had no authority, under the evidence, to receive moneys paid amicably and without suit; and the leaving of the check at his office was not payment to the plaintiff, even if it was afterwards received and accepted by him.

Answer: Gentlemen, I cannot say that, under the evidence, that is correct, and I therefore disaffirm that point. We think

Charge of Court below.

there is evidence for you to determine whether Mr. Bliss had that authority, and if he had, and the association recognized his receipt of it, that would be sufficient to relieve this defendant.[6]

4. The association plaintiff was not bound, under the evidence, by the act of either Mr. Bradley or Mr. Bliss, in assuming to give the amount due on the mortgage, or in receiving the Beebe check.

Answer: I say to you that in our judgment, and under the evidence, they were; and I therefore disaffirm that point.[7]

5. To constitute a lawful payment of the mortgage, the amount due thereon must have been paid to the association or to some one duly authorized to receive the money on its behalf, and under the evidence in this case no payment was made either to the association or to any one with authority to receive it.

Answer: I shall have to affirm a part of this and disaffirm a part. The amount due must have been paid to the association or to some one authorized to receive the money on its behalf. But I cannot say no payment was made to the association, or to any one authorized to receive it. You must determine that. We cannot say there was no such authority.[8]

6. If George Beebe, Jr., was acting in the transaction as the agent of Kilpatrick and was intrusted by Kilpatrick with moneys which he subsequently embezzled, the loss must fall upon Kilpatrick.

Answer: If he was acting as the agent of Mr. Kilpatrick and had no other interest in the transaction, we affirm that point.

8. The mortgage in suit covered other property than that conveyed to Kilpatrick, and it required to satisfy it about $3,000. Neither Mr. Bradley nor Mr. Bliss, under the evidence, had any authority to accept less than the full amount due upon it. The giving of the Beebe check for $1,380.20, even if it had been accepted by Mr. Bliss, was not payment of the mortgage.

Answer: Gentlemen, I must disaffirm that point in its particular terms. You will bear in mind what I have said in my general charge bearing upon the principles set forth in that point.[9]

Charge of Court below.

The defendants request me to say:

1. If the jury believe that after the mortgage in suit was executed and delivered by Oliver Troth to the plaintiff, the said Troth sold and conveyed one of the houses in the mortgage to Kilpatrick to be clear of encumbrance, and that when the deed from Troth to Kilpatrick was about to be delivered, Kilpatrick applied to the secretary of the plaintiff to ascertain how much was required to be paid to relieve his house from the plaintiff's mortgage, and was informed by the secretary of the plaintiff that the sum of $1,380.20 was sufficient for the purpose, and that Kilpatrick then directed Beebe, in whose hands he had placed $1,500, to pay said sum of $1,380.20 to the plaintiff, and that Bradley, the secretary, thereupon directed Beebe to pay said money to the solicitor of the plaintiff, which was accordingly done on June 6, 1885, in a check of Beebe, to the order of Bliss on the Chester National Bank; that on June 6, 1885, Bliss received the said check and reported to the plaintiff that he had it, and asked for instructions, and that the said check at that time was good.; that said check was retained by Bliss without presentation to the bank for payment until after August 1, 1885, and when presented was not good, the said Beebe having in the meantime withdrawn said money from said bank and misappropriated it, and having become insolvent and still remaining so, whereby the money placed in Beebe's hands by Kilpatrick has been lost, they should render their verdict for the defendant, Kilpatrick.

Answer: We affirm that point generally, with the exception that Mr. Bliss must not only have received the check, but he must have accepted it for this association; and you will bear in mind in that connection what I have said upon that point in my general charge, and upon Mr. Bliss's receiving the check. I say, if he received it and accepted it with the understanding which these parties had in view, then I affirm the point with that qualification.[10]

—The jury returned a verdict for the defendants. A rule for a new trial having been discharged, and judgment entered, the plaintiff took this appeal, assigning for error, inter alia:

1-3. The admission of defendants' offers.[1 to 3]

4. The part of the charge embraced in [ ][4]

5-9. The answer to plaintiff's points.[5 to 9]

Arguments.

10. The answer to defendants' point.[10]

*Mr. O. B. Dickinson*, for the appellant :

1. The defendant Kilpatrick is precluded from benefiting by the defence set up in the court below, for the reason that the wrong done was the act of Beebe who was his agent. The money was the defendant's money; the debt to be paid was the defendant's debt, and the check which was drawn by his agent, Beebe, for its payment, was in law the check of the defendant himself. The withdrawal of the fund from the bank by Beebe was undoubtedly a fraud, and, so far as the plaintiff is concerned, that fraud was the act of the defendant: 1 Parsons on Cont., §§ 1, 9; Middlesex v. Thomas, 5 C. E. Green ——; McIntyre v. Kennedy, 29 Pa. 448.

2. Moreover, the jury were not justified in finding a payment to the association, for the reason that Bliss was not shown to have had authority from the association to receive payment. The only evidence of any authority given to him, was in the by-laws, the letter of attorney, and the special minute of June 6, 1885. None of these have such authority. The by-laws inferentially authorize him to make collections "when ordered by the board of directors," but not otherwise; and the letter of attorney was a mere power to enter satisfaction of mortgages upon the record. The minute of June 6, 1885, authorized him to satisfy this mortgage only upon payment "to the association" of the whole amount due upon the mortgage.

3. That, under his general powers as solicitor or attorney of the association, Bliss had no authority to receive payment of loans, is conclusively established by decided cases: Seiple v. Irwin, 30 Pa. 513; Hays v. Lynn, 7 W. 524; Heffernan v. Addams, 7 W. 116. All the proof of his authority was in writing, and it was clearly for the court to construe and not the jury: 2 Whart. Ev., § 966; 4 Phill. Ev., 1420, note. It does not show the authority alleged to exist, and therefore the evidence of the check to Bliss should have been rejected, and the plaintiff's third and fifth points should have been affirmed.

4. The admission of the testimony as to Troth's paying $32 after this alleged payment to Bliss, amounts to admitting evidence of declarations of Troth to the effect that in his opinion the $3,800 mortgage had been paid. It was objectionable both

because it was equivalent to hearsay evidence, and also because it was the self-serving declaration of one who was not only the debtor but was likewise a party to this suit. And Bradley's declarations as to the amount due upon the Kilpatrick house were inadmissible: Johnston v. B. & L. Ass'n, 104 Pa. 394. There was no evidence that he had the authority of the board of directors, without which he could not bind the association: Gass v. B. & L. Ass'n, 95 Pa. 101; Penn. Central Ins. Co. v. Kniley, 2 Pears. 229; Angell & Ames on Corp., 249.

*Mr. W. B. Broomall*, for the appellees:

1. The objection that the plaintiff is made responsible for the act of the defendant's agent, was disposed of when this case was here before: Kilpatrick v. B. & L. Ass'n, 119 Pa. 30. Beebe was Kilpatrick's agent to pay the money to the association. His agency terminated when payment was made. Payment was constructively made when the check was accepted by Bliss. Hence the subsequent embezzlement was not the act of Kilpatrick's agent. And we submit that there was proof, full and ample, of both positive and constructive authority in the secretary to settle the amount owing, and in the solicitor to receive payment. While a corporation is affected by its by-laws, outsiders are not charged with a knowledge thereof, in dealing in good faith with the executive officers of the corporation: Taylor on Corp., §§ 196, 197.

2. The evidence from the pay rolls, as to the payments made by Troth, after the date of the transaction with the solicitor, was simply an abortive effort to obtain something from the enemy's camp as to the manner in which the association had treated, upon its books, the payment made to the solicitor. The whole effort miscarried, it appearing that the payments made by Troth had no significance or bearing upon the question. And the court was not asked to construe the written evidence referred to in the plaintiff's argument. Had it been asked to do so, it would have given the same construction which the jury gave. When the jury have construed a writing correctly, there is no just cause of complaint: Jones v. Kroll, 116 Pa. 85; Miller v. Slate Co., 129 Pa. 81. The court is not bound to decide on the construction of a writing, when matters of fact are intermingled with it: Denison v. Wertz, 7 S. & R. 371.

Opinion of the Court.

An admixture of parol with written evidence draws the whole to the jury: Sidwell v. Evans, 1 P. & W. 383. The construction of writings, as relating to the solution of disputed facts, belongs to the jury: McGee v. Northumberland Bank, 5 W. 32.

3. The objection embraced in the first assignment of error does not specifically relate to declarations of Bradley as to the amount due. The question objected to was as to what occurred at Bradley's office. The witness went on to testify that the balance due as stated by Bradley was $1,380.20. But Bradley had already testified that the practice was to recognize settlements made by him, that he kept the accounts, and that the amount owing upon the Kilpatrick house was $1,380.20. There is a marked difference between a declaration such as that considered in Gass v. B. & L. Ass'n, 95 Pa. 101, and the declaration of the secretary, in our case, as to the amount owing according to accounts which he was charged with keeping. The declarations offered in Johnston v. B. & L. Ass'n, 104 Pa. 394, were in reference to a mortgage in course of foreclosure, and not, as is this case, in reference to the voluntary payment of a mortgage. Different rules apply in these different cases. We are not seeking to hold the association estopped by erroneous information communicated. The information was correct, and was shown to be so upon the trial.

OPINION, MR. JUSTICE STERRETT:

When this case was here on writ of error to the judgment against defendants for want of a sufficient affidavit of defence, we held that the averments contained in the affidavit were sufficient to carry the case to a jury, and, if defendants succeeded in passing them, they would be entitled to a verdict: Kilpatrick v. B. & L. Ass'n, 119 Pa. 30. Without referring specially to the evidence introduced by the defendants on the trial, it is sufficient to say that it tended to prove every material allegation of fact contained in the affidavit referred to, and, having been fairly submitted to the jury, under proper instructions, the verdict for defendants must now be regarded as a finding of those facts in their favor.

The evidence referred to in the first, second, and third spec-

Opinion of the Court.

ifications was neither incompetent nor irrelevant, and hence there was no error in admitting it.

In view of the testimony, partly written and partly oral, bearing on the authority of Mr. Bliss, the solicitor of the association, to receive the Beebe check in payment of the lien against the house and lot sold and conveyed by Troth to Kilpatrick, etc., there was no error in the instructions given in those portions of the charge recited in the fourth specification. It was shown, among other things, that on June 5, 1885, after the mortgage in suit was executed, Troth, the mortgagor, sold one of the lots to Kilpatrick for $2,200, clear of all encumbrances. When the deed was about being delivered, Troth, Kilpatrick, and George Beebe met at the office of the association, and were there informed by Bradley, its secretary, that the payment of $1,380.20 would be required to obtain a release of the association's lien on the lot that Kilpatrick was purchasing. Thereupon Troth directed Beebe, in whose hands he had placed $1,500 for that special purpose, to pay Bradley the said sum of $1,380.20, in satisfaction of the association's claim against the lot in question. Bradley, instead of receiving the money, directed Beebe to pay it over to Bliss, the solicitor of the association. That was done on the following day by giving him his check on the Chester National Bank, where he then had and continued to have funds on deposit applicable to the payment of the check until the first of August following. But, instead of presenting the check within a reasonable time, Bliss held it until September, after Beebe had withdrawn the money and become insolvent. In consequence of the delay in presenting the check and Beebe's insolvency, the money was lost, without any fault of Kilpatrick, who had reason to believe that Beebe's check had been presented and paid.

On the day the solicitor received the check, he reported to the association in writing, inter alia, as follows: "I have received to-day from George Beebe a check for $1,380.20, which I understand is intended to secure a release of the mortgage against one of Mr. Troth's houses," and asked for instructions as to what he should do. The minutes of the association contain the following entry: "The solicitor's report was presented and accepted. The solicitor stated that it was proposed to pay off the loan on the eastern house, which this association gave to

Opinion of the Court.

Oliver Troth on property on Washington street, between Barclay and Penn streets. On motion of Mr. Spencer, the solicitor was authorized to satisfy the mortgage upon payment of the amount due the association." A general power to the solicitor to satisfy all mortgages and judgments in favor of the association as fully "as if the same were done by the proper officers of said association in their official capacity," was given in evidence.

In addition to the oral and written evidence above referred to, there was other verbal testimony tending to show an understanding that the lot purchased by Kilpatrick should be released on payment of the sum named by the secretary of the association, and that the check was accepted by the solicitor as payment, etc. Beebe testified, in substance, that part of the money which he had on deposit when he gave the check was the proceeds of another mortgage which he had placed on the lot, with the understanding that it should be a first lien, and in order to make it so it was necessary that the association's claim should be paid; that he gave the check for that purpose, and it was so understood by the solicitor. If the written evidence in question had stood alone, it would have been the duty of the court to have construed it; but, in view of the oral testimony relating to and necessary to be considered in connection with the written evidence, there was no error in submitting the whole to the jury, under proper instructions. When matters of fact, depending on oral testimony, are connected with and necessary to a proper understanding of the written evidence, the court is not bound to construe the latter as though it stood alone. An admixture of oral and written evidence draws the whole to the jury: Denison v. Wertz, 7 S. & R. 372 ; Sidwell v. Evans, 1 P. & W. 383 ; McGee v. Northumberland Bank, 5 W. 32.

There was no error in the answers of the court to the plaintiff's points recited in the fifth to ninth specifications, inclusive, nor in the answer to defendant's first point covered by the tenth specification. The remaining specifications are not sustained.

Judgment affirmed.